## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND
## NORTHERN DIVISION

| | |
|---|---|
| **ISRAEL K. NEGASH, et al.**, | ) |
| | ) |
| Plaintiffs, | ) CIVIL ACTION NO. 1:17-cv-01954 |
| | ) |
| **v.** | ) |
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| Defendant. _____ | ) |

### PLAINTIFFS' RESPONSE AND BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS OR, IN THE ALTERNATIVE FOR SUMMARY JUDGMENT

*Andrew Z. Tapp*

Andrew Z. Tapp, Esquire
Pro Hac Vice
Florida Bar Number:  68002
Metropolitan Law Group, PPC
1971 W. Lumsden Road, #326
Brandon, Florida 33511-8820
(813) 228-0658
Andrew@Metropolitan.legal
Lajeana@Metropolitan.legal

-and-

William N. Sinclair, Esquire
Maryland Bar Number: 28833
Pierce C. Murphy, Esquire
Maryland Bar Number: 30030
Silverman, Thompson, Slutkin and White
201 N. Charles Street
Baltimore, Maryland 21201
(410) 385-2225
bsinclair@mdattorney.com
pmurphy@mdattorney.com

**COUNSEL FOR PLAINTIFFS**

## TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................................1

        A.      DE NOVO ACTION FOR JUDICIAL REVIEW ....................................................1

II.     WITH RESPECT TO THE MOTION TO DISMISS ........................................3

        A.      GENERAL STANDARD OF REVIEW FOR MOTION TO DISMISS ....................3

        B.      7 U.S.C. §2023 ...........................................................................................4

        C.      ARGUMENT WITH RESPECT TO THE MOTION TO DISMISS ..........................4

        D.      DEFENDANT'S MOTION TO DISMISS SHOULD BE DENIED............................6

III.    WITH RESPECT TO THE MOTION FOR SUMMARY JUDGMENT ..........6

        A.      STATE OF DISCOVERY ..................................................................................6

        B.      UNDISPUTED FACTS .....................................................................................7

        C.      FACTS OUTSIDE OF THE COMPLAINT............................................................8

                1.      THE NEXUS BETWEEN THE ALERT PATTERNS AND THE PRESENCE OF
                        TRAFFICKING ..................................................................................9

                2.      MULTIPLE TRANSACTIONS IN A SHORT TIME................................13

                3.      TRANSACTIONS INVOLVING THE DEPLETION OF THE MAJORITY OR ALL
                        OF A HOUSEHOLD'S BENEFITS IN A SHORT TIMEFRAME ..............15

                4.      LARGE PURCHASES ........................................................................16

IV.     STATEMENTS OF FACT:  THE PLAINTIFFS' BUSINESS .........................17

V.      AUTHORITIES PERTINENT TO THIS MOTION .........................................18

        A.      REVIEW OF ADMINISTRATIVE DECISIONS IN SNAP CASES ....................18

        B.      ON-POINT CASE LAW PERTAINING TO EARLY MOTIONS FOR
                SUMMARY JUDGMENT..................................................................................19

        C.      SUMMARY JUDGMENT STANDARDS ..........................................................19

VI.     LEGAL ARGUMENT.........................................................................................................20

     A.     THE COURT SHOULD DENY SUMMARY JUDGMENT IN LIGHT OF THE GENUINE DISPUTE AS TO WHETHER ANY TRAFFICKING OCCURRED ......................................20

     B.     PLAINTIFFS' EVIDENCE CREATES GENUINE DISPUTES OF MATERIAL FACT THAT MUST BE RESOLVED AT TRIAL, OR AT LEASE GIVEN THE BENEFIT OF DISCOVERY 22

VII.    CONCLUSION....................................................................................................................24

# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND
## NORTHERN DIVISION

| | |
|---|---|
| **ISRAEL K. NEGASH, et al.**, | ) |
| | ) |
| Plaintiffs, | ) CIVIL ACTION NO. 1:17-cv-01954 |
| | ) |
| **v.** | ) |
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| Defendant. | ) |

## PLAINTIFFS' RESPONSE AND BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS OR, IN THE ALTERNATIVE FOR SUMMARY JUDGMENT

The Plaintiffs, Ethio, Inc. d/b/a Sunoco Food Mart, and Israel K. Negash, an Individual, by and through their undersigned counsel, Andrew Z. Tapp, Esquire, file the following Response and Brief in Opposition to Defendant's Motion to Dismiss or, In the Alternative for Summary Judgment.

## I. INTRODUCTION
### A. *DE NOVO* ACTION FOR JUDICIAL REVIEW

This is a *de novo* action for Judicial Review of the United States Department of Agriculture's permanent disqualification of the Plaintiffs from participation in the Supplemental Nutrition Assistance Program (SNAP) as a retailer under 7 C.F.R. §278.6, §279.7, and 7 U.S.C. §2023(13).  In pertinent part, 7 U.S.C. 2023(15) and (16) state that the District Court is to determine by "trial *de novo*" the **validity** of the administrative disqualification issued by the Food and Nutrition Service, and should such determination be invalid, enter judgment in accordance with the law and the evidence.  It is important to note that the statute does not specifically require that the Plaintiffs prove the transactions in question to be valid, but instead that the determination is invalid.  Such invalidity can occur as the result of the transactions being reasonably explained (see *Skyson USA, LLC vs. United States*, 2010 WL 651032 (D. Hawaii 2010)) or through an error

in the government's process or analysis of the data (see *Altawel vs. United States*, W.D.N.Y. 2014 WL 7272967[1].  Please review the footnote below.).

The Court is not bound to the Administrative Record in this case, nor is the administrative record immune from the rules of evidence.  See *Ibrahim vs. United States*, 834 F.2d 52, 53-54 (2d. Cir. 1987).  In perhaps one of the more well outlined SNAP review cases, the Sixth Circuit in its decision *H.T. Saunders vs. United States*, 507 F.2d 33 (6th Cir. 1974) outlined what task rests before the District court in judicial reviews:

> "In providing for a trial de novo upon court review of disqualification determinations, Congress intended a broader scope of review than that permitted under the general provisions of the Administrative Procedure Act.  5 U.S.C §706; J.C.B. Super Markets, Inc. vs. United States, [57 F.R.D. 500, 502-503 (W.D.N.Y. 1972)].  This requires a reexamination of the entire matter rather than a mere determination of whether the administrative findings are supported by substantial evidence.  *Great Atlantic & Pacific Tea Co. vs. United States*, 342 F.Supp. 492, 493 (S.D.N.Y. 1972); contra, *Marbro Foods, Inc. vs. United States*, 293 F.Supp. 754, 755 (N.D. Ill 1968).  The court should make its own findings of fact based on the preponderance of the evidence and not limit itself to matters considered in the administrative proceedings.  *J.C.B. Super Markets, Inc.*, supra, 57 F.R.D. at 503.  Even if the unsworn statements relied upon by the government were sufficient to support a determination at the administrative level, the provision for a trial de novo requires that the district court make its determination on evidence of a kind and quality sufficient to support findings of fact under Rule 52(a), Fed.R.Civ.P.  **Since the procedures followed at the administrative level do not provide for discovery or testing the evidence of the Department of Agriculture by cross-examination, it is particularly important that an aggrieved person who seeks judicial review in a trial de novo not be deprived of these traditional tools unless it is clear that no issue of fact exists**.  As the court pointed out in *Miller vs. United States*, 54 F.R.D. 471 (W.D. Pa. 1972), all doubts as to the presence of a genuine issue of material fact should be resolved against a party moving for summary judgment."  *Id* at 36. Emphasis added.)

---

[1] This order on the government's motion for summary judgment was subsequently vacated *after* Mr. Altwell and the government came to a settlement agreement involving Mr. Altwell's reinstatement into the SNAP program.  In the order vacating (2015 WL 10013741), the court notes that the prior order is vacated and to be considered of no effect.  However, this is the result of the government taking diabolical steps to eliminate case law that favors stores in SNAP violation reviews.  A casual perusal of the more than forty years of case law on these matters turns over fewer than ten cases where the government's decision is overturned.  Such a result is not because the Department of Agriculture has been so successful in their efforts, but rather because they have taken extraordinary measures to cover up positive case law, such as that in *Altawel*.  This case is therefore submitted to this court as persuasive (secondary) support, and citing an analysis that is factually correct: the failure of the department to accurately compare a subject store to other stores results in a fatally flawed statistical analysis.

In this particular instance, discovery has not yet begun, let alone been conducted at all. The Plaintiffs have never seen the Administrative Record before the government filed it in this matter, and has not had even an iota of opportunity to subject the government's data analysis to cross examination.  Furthermore, the Plaintiffs have never had subpoena power to gather the households and other witnesses to provide supporting testimony and evidence on behalf of the store.

For the reasons set forth herein, the Defendant's Motion to Dismiss or, In the Alternative, for Summary Judgment must be denied because (1) the Plaintiffs have stated a cause of action under 7 U.S.C. §2023, and (2) material issues of fact remain for evidentiary presentation, including the weight of the Defendants' data and computer programs, as well as the weight of the Plaintiffs' evidence, in addition to the fact that discovery in this matter is far from completed.

## II.   WITH RESPECT TO THE MOTION TO DISMISS:
### A.   GENERAL STANDARD OF REVIEW FOR MOTIONS TO DISMISS

When reviewing a motion to dismiss filed under Federal Rule of Civil Procedure 12(b)(6), the Court must "accept the truth of all factual allegations and must draw all reasonable inferences in favor of the non-movant."  *Gross v. German Found. Indus. Initiative*, 549 F.3d 605, 610 (3d Cir. 2008).  Fed. R. Civ. P. 8(a)(2) requires only that the pleader "state a short and plan statement showing that the pleader is entitled to relief" so as to "give the defendant fair notice of what the . . .claim is and the grounds upon which it rests."  *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (citing *Bell Atlantic Corp. v. Twombly*, 500 U.S. 544, 555 (2007)).

In deciding a motion to dismiss for failure to state a claim, "[f]irst, the factual and legal elements of a claim should be separated.  Second, a District Court must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim

for relief.'" *Fowler v. UPMC Shadyside*, 578, F.3d 203, 210-211 (3d Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).  "A complaint may not be dismissed merely because it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits.  The Supreme Court's formulation of the pleading standard in Twombly does not impose a probability requirement at the pleading stage, but instead simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element." *Mell v. GNC Corp.* CIV.A. 10-945, 2010 WL 4668966at *4 (W.D. Pa. Nov. 9, 2010) (citing *McTernan v. City of York*, 564 F.3d 636, 646 (3d Cir. 2009)).  "So long as the complaint sets forth a 'plausible' claim to relief, [a] defendant's motion to dismiss must fail."  *Kolar v. Preferred Real Estate Investments, Inc.*, 361 F. App'x 354, 359 n.5 (3d Cir. 2010) (citation omitted).

### B.      7 U.S.C. §2023

In plain language, 7 U.S.C. §2023(13) creates a cause of action for Judicial Review. "if [a disqualified store] feels aggrieved by such a final determination, it may obtain judicial review thereof by filing a complaint against the Untied States…. Within thirty days after the date of delivery or service of the final notice of determination upon it, requesting the court to set aside such determination." (2008)

Thus the stature requires three things: (1) that a requesting store be disqualified; (2) that the requesting store file a complaint against the United States; and (3) that the store request the court to set it aside.  No other facts need be alleged to automatically qualify for judicial review.

### C.      ARGUMENT WITH RESPECT TO THE MOTION TO DISMISS

The Government contends that the Plaintiff has failed to state a cause of action upon which relief can be granted.  This is an absolutely frivolous and bizarre argument for the government to make. The statute, 7 U.S.C. §2023, provides a cause of action, subject matter

jurisdiction and personal jurisdiction to this Court in reviewing a disqualification of a SNAP retailer.  Furthermore, the Plaintiffs participated, by the Defendant's own admission, in both phases of the administrative process ((1) response to charging letter; (2) administrative appeal), and received a "Final Agency Decision."  The right to judicial review is virtually automatic under any reasonable reading or interpretation of the language set forth between subsections (13) and (17).

Furthermore, to play out the government's position, if the Plaintiffs, after having exhausted administrative remedies, and having never conducted any discovery in the matter (as the administrative process is as informal as it could be), couldn't file a judicial appeal, where in this entire matter would due process be found?  The government could send a Charge Letter to a store, make ridiculous errors in its data analysis, disqualify the store, then process an administrative appeal upholding the errors, then not be able to file a judicial review, all without the store having the ability to even look at the government's flawed analysis.

The government's position would be comical, if it weren't utterly terrifying.  Effectively, the government is asking this Court to prevent a store from ever having meaningful review of FNS' data analysis and determination, granting it unfettered authority over disqualifications without evidentiary process or disclosure of the basis for its decisions.

Benign though it may seem in Mr. Lazerow's motion, the government is advocating tyranny over the SNAP process: an "absolute power vested in a single ruler" (Merriam-Webster, 2017); "arbitrary or unrestrained exercise of power" (Dictionary.Com, 2017).  Without judicial review of the executive branch's activities through the USDA and FNS, in conjunction with an informal discovery-deprived administrative process, "tyranny" is precisely the scope of power the government seeks this Court to grant it.

### D.    DEFENDANTS MOTION TO DISMISS SHOULD BE DENIED

The statute states plainly on its face that the Plaintiffs have a cause of action for Judicial Review if they have been (1) disqualified; (2) file a lawsuit within thirty (30) days of receiving the disqualification; and (3) request the Court to overturn the decision.  All three have occurred, thus the Motion to Dismiss is frivolous.

Furthermore, as noted in *H.T. Saunders* above, the Plaintiffs should be afforded an opportunity to conduct discovery in order to adequately present their case.  A dismissal of this matter *before the government has even bothered to file an Answer to the Complaint* deprives the Plaintiffs of any semblance of substantive due process.

Given the clearly frivolous and baseless argument set forth by the Defendant, the Plaintiffs request the award of attorney's fees and costs associated with preparing this response.

### III.    WITH RESPECT TO THE MOTION FOR SUMMARY JUDGMENT
#### A.  STATE OF DISCOVERY

To point out the obvious, discovery has not even begun in this matter.  A request for discovery was sent to the Defendant previously, but an objection was lodged by the government indicating that this District only permits discovery pursuant to an order from this Court setting out such discovery.  The Plaintiffs have never seen the Administrative Record before October 20th, 2017, and has been blocked from making any attempts to begin to evaluate the record since then.  Of note, the government's Administrative Record purports to compare the Plaintiffs' store to other stores, which are unidentified in the A.R., as a basis for the decision to issue a permanent disqualification. (A.R. 193 – 195).  The Plaintiffs should be permitted an opportunity to identify those stores, and explain differences in inventory, operation and maintenance, business models and clientele that would explain differences in transactions.

The Defendant also cites an analysis and evaluation of household spending patterns and habits (A.R. 189-191).  These households have not been made available to the Plaintiffs for deposition or discovery.  We (to include the Government) know nothing about the size of the households, composition

of the members of the households, needs or personal shopping preferences.  Further, the A.R. lacks complete analyses of their transaction histories, instead only including scraps in support of the government's conclusions.

Outside of the households and the comparison stores utilized by the government, there is also the matter of the Plaintiffs' evidence presentation.  When this matter resided at the administrative level, the Plaintiffs lacked subpoena power to compel document production and depositions of vendors who could verify the store's inventory ordering and contents.  This evidentiary issue played into the government's decision (A.R. 214-216), and can only be remedied at this stage of the proceedings.

Finally, and as noted by the government in its brief in support of the Motion for Summary Judgment, the Plaintiffs contest the link between the transaction patterns identified by the government and the act of trafficking.  On November 9th, 2017, Plaintiffs' counsel deposed Government's 30(b)(6) witness pertaining to the ALERT system (the computer program which identifies those transactions that the government subsequently labels "suspicious), Mr. Douglas Wilson, who testified that the government has no statistical studies to support its contention that the patterns are linked with trafficking, nor does the government know where those patterns originated.  Such was Mr. Wilson's testimony in 2016 when he was deposed by the undersigned as a 30(b)(6) on identical subject matter. In short, the government lacks foundation for its position that a linkage between "trafficking" and the patterns exist, and despite a year's worth of lead time between the first of such depositions and the second, the government still does not have any statistical research to support its data analysis or pattern selection.

### B.  UNDISPUTED FACTS.

The Government has placed itself in a quandary by failing to Answer the Complaint.  As held in *Rogers v. Girard Trust Co.*, 159 F.2d 239 (6th Cir. 1947), "on motion for summary judgment, no answer having been filed, every allegation of the complaint is to be taken as true. Rogers at 241 citing *Doehler Metal Furniture Co. vs. United States*, 149 F.2d 130, 135 (2d. Cir. 1942); *Weisser v. Mursam Shoe Corporation,* 127 F.2d 344 (2d. Cir. 1942); *Ramsouer vs.*

*Midland Valley R. Co.,* 135 F.2d 101 (8th Cir. 1943).   Therefore, every allegation in the Complaint is to be considered true in this matter, and thus undisputed.

Of particular pertinence, are paragraphs 27 and 28 of the Complaint, which allege that the government used a computer program that arbitrarily determined that the Plaintiffs' EBT transactions were inherently suspicious; and that the evidence indicated that the government ailed to take into account the business practices of Sunoco Food Mart, and the pricing structure maintained by the store for SNAP eligible items, and the specialized clientele who shop at the store.   Paragraphs 29, 30 and 31 continue by alleging that the government relied solely on assumptions resulting from the data in its possession and summarily disregarded the plausible and likely explanations provided by the Plaintiffs.   Accordingly, the government acted improperly and impermissibly to permanently disqualify the Plaintiff from participation in SNAP.  Finally, the disqualification should be set aside.

All of this, for purposes of the government's premature motion for summary judgment, are deemed admitted.  On that those allegations alone, it is clear that the government is not entitled to summary judgment in its favor.

C.   FACTS OUTSIDE OF THE COMPLAINT

The Plaintiffs dispute the government's positions as set forth in the A.R. as follows: (1) That the patterns sought by the ALERT system (and alleged by the Defendant to be evidence of trafficking) are not based upon empirical data, case studies, or any other accepted form of data modeling or analysis which create a nexus between the existence of the patterns and the act of trafficking. Thus, the disqualification decision related thereto is inherently invalid; (2) that neither the ALERT system nor the Defendant's evaluation process is capable of distinguishing the existence of trafficking from unusual shopping habits of particular SNAP participants; (3)

that the Plaintiffs have maintained and sold sufficient inventory to support the alleged transactions; (4) that transactions were not made from individual accounts in inappropriately short time frames; (5) that  individual recipient benefits were not exhausted in unusually short periods of time; (6) that transaction sizes are largely the result of the store's inventory, a circumstance not commonly found in other stores in Maryland to which the Plaintiffs were compared, materially effecting the Department's evaluation; and (7) that the individual transactions did not involve trafficking.

As noted above, the Plaintiffs have not had an opportunity to conduct discovery in this matter both as a result of the Defendant's not responding to the Plaintiffs' Discovery, and not being able to coordinating the depositions of the witnesses involved in this matter (the analyst, section chief, administrative review officer, and households), and as a result of how the case has been structured. Nevertheless, the Defendant's allegations set forth in the Motion for Summary Judgment are disputed by the Plaintiffs as follows:

(1) <u>The Nexus Between the ALERT Patterns and the Presence of Trafficking</u>

The Defendant's Motion for Summary Judgment takes for granted this idea that the patterns, such as "Rapid Withdrawals", "Depletion of the Majority or all household's benefits in a short timeframe" and "Excessively Large Transactions" correlate specifically with trafficking. This nexus between pattern and violation is not explained in the A.R., nor in the Motion for Summary Judgment – it is simply accepted.  The government cites a number of cases where other courts have accepted the pre-supposition that these patterns indicate violations.  In none of these cases have the plaintiffs challenged the accuracy of the patterns or the correlation of the patterns with trafficking. Accordingly, for purposes of those cases, the courts have been able to simply accept the government's alleged nexus between trafficking and the patterns as unrefuted.

As mentioned above, the undersigned counsel has twice deposed the Government's 30(b)(6) witness who has the most knowledge about the ALERT system, Mr. Douglas Wilson. The 2016 deposition is attached in its entirety as **Exhibit A**.  The undersigned has not received a copy of the 2017 deposition transcript yet, but it is likely to be received in the immediate future.

Because only one of the transcripts is in the possession of the Plaintiffs at this time, the following facts and information are drawn from the 2016 deposition transcript.  The ALERT System has been in existence in its current form since the late 1990's.[2]  The program is designed to detect and identify fraud within the EBT system[3], though then Department acknowledges that it cannot actually identify fraud on its own,[4] nor does the system have the ability to determine what "normal" transactions should be.[5]  Furthermore, the ALERT System lacks the ability to distinguish different types of violations,[6] and doesn't account for atypical shopping patterns of individual participants[7] or how many persons are shopping together in one transaction.[8]

With respect to the threshold amounts and frequency, these amounts and occurrences have been the same since the inception of the program in the 1990's.[9]  That means that if a pattern is looking for a particular dollar amount (such as "large transactions"), the System has not adjusted for inflation since at least 1999.  In that same period of time, according to the United States Department of Labor, Bureau of Labor Statistics, inflation has increased $.46 on the dollar.[10]  So, if a qualified purchase in 1999 cost $20.00, and was below the threshold amount of

---

[2] The program's origins in the 1990's, see Wilson Deposition Transcript, Page 21 starting on line 11.
[3] Wilson Transcript, Page 21 starting on line 9.
[4] Wilson Transcript, Page 25 Line 16.
[5] Wilson Transcript, Page 60 Lines 1-3.
[6] Wilson Transcript, Page 65 Lines 14-19.
[7] Wilson Transcript, Page 70 Lines 14-21.
[8] Wilson Transcript, Page 71 Lines 3-5.
[9] Wilson Transcript, Page 27 Lines 4-17.  Mr. Wilson indicated that he was certain the thresholds had not changed since at least 2006, but was of the belief that they haven't changed since the 1990's.
[10] The Plaintiff would ask that this Court take Judicial Notice of the Consumer Price Index and the records maintained by the Bureau of Labor Statistics for purposes of evaluating this amount.

$24.00 in the ALERT System, the very same transaction in 2016 would cost $29.20 and rise above the threshold – earning it the status of "suspicious transaction" despite the fact that none of the details of the transactions had actually changed.

Though the Defendant waffles between saying that the transactions are indicative of fraud or just merely "unusual"[11], Mr. Wilson states, "the fact that we look at these analyses and look for these patterns does not indicate that the retailer is committing fraud.  This is one factor that the [analyst] uses along with other factors to make a determination."[12]  Other factors include: where is the store located; where are there other retailers in the immediate geographic area; what inventory the store maintains; and past complaints.[13]  Why these factors are significant is not clear from Mr. Wilson's Deposition, and would need to be asked of the Defendant's analyst.  For purposes of this matter, past complaints are not contained within the A.R., nor are the identities of the comparison retailers.

According to the government, the ALERT system's patterns are believed to be based upon interviews with Retailer Investigation Branch (RIB) investigators, who stated that these transaction types are associated with SNAP violations.  I have attached hereto a report (**Exhibit B**) that contains both empirical data (on-site undercover investigations conducted by the Retailer Investigation Branch looking for SNAP violations in retailer's stores) and ALERT charging data (page 8).  Presumably, a data driven system, such as ALERT, should demonstrate a proportionate return on results within the margin of error between the empirical evidence (on-site investigations where trafficking is actually witnessed) and the data drive circumstantial evidence (such as this case) in order to be considered accurate.  The existence of this proportionality between on-site investigations by the RIB and analysis investigations by the Investigative

---

[11] Wilson Transcript, Page 56 Lines 12-15, Page 58 Line 5.
[12] Wilson Transcript, Page 50 Lines 12-16
[13] Wilson Transcript, Pages 53 and 54, Generally.

Analysis Branch (IAB, which is the office involved in this matter) was something that Mr. Wilson indicated should exist:

> "Q:    …If [ALERT] is going to be looking for patterns, you would have to have an original pile of data… to derive those patterns from when comparing them to new data coming in when you're looking for functionally the same symptoms.  Is that correct?
> A:    Correct." (Wilson Transcript Page 26, Lines 4 – 12)

However, the *Fiscal Year 2016 At A Glance* Undercover Retailer Investigations data shows the opposite: at least 1,557[14] stores were disqualified for trafficking in SNAP benefits using the data analysis process, or approximately 33.17% of the stores identified by the ALERT system as potentially violating the transactions. (**Exhibit C**)[15] Conversely, the empirical data (the actual Undercover Retailer Investigations) shows that only 7.98% of the stores identified by ALERT actually have trafficking.[16]  This means that roughly 75.91% of the stores convicted by the Defendant of Trafficking through data analysis are, statistically, wrongly convicted.[17]  While the Defendant maintains that undercover investigations that show no violations don't exclude the possibility of trafficking, the very system (ALERT) upon which the government bases its disqualifications is predicated upon the observations and success of the undercover investigations.  Simply put, if the undercover investigations find no violations with the store, and ALERT is based upon results from the undercover investigations, the relationship between the disqualification rates should be much closer together than they are.  The instant case falls into

---

[14]  1,845 stores were permanently disqualified for trafficking; 288 of those disqualifications were the result of undercover retailer investigations; 1,557 were disqualified, presumably, through data analysis and the process involved in this case.

[15]  Page 1 of the *Fiscal Year at a Glance* document, lists 8,300 investigations of retailers.  Page 8 indicates that 3,606 of these investigations were Undercover Retailer Investigations, leaving 4,694 investigations conducted using the data analysis process involved in this case.  $1,557 \div 4,694 = 33.17\%$

[16]  There were 3,606 undercover investigations conducted in 2016, 288 had positive results of trafficking, or 7.98%.

[17]  33.17% - 7.98% = 25.19% difference; 25.19% x 4,694 investigations = 1,182 positive investigations more than the empirical data would support; $1,182 \div 1,557$ total convictions = 75.91% of the convictions are likely erroneous.

this divide, where the government's system has a built in assumption of trafficking for which no correlation can be made to the data.

(2) <u>Multiple Transactions in a Short Time</u>

As noted in the case *Skyson USA, LLC vs. U.S.*, 2010 WL 651032, 9-10 (D. Hawai'i 2010), there can be a number of explanations for why multiple transactions are made in a short period of time.  These include: the SNAP household's logistical challenges of not being able to carry everything all at once, having multiple family members make purchases in the same visit, and making supplemental trips for things that may have been previously forgotten.   Also, like in *Skyson*, there are no big carts involved in the Plaintiffs' store, and the clerks know the prices for each of the items by heart.    It is possible for a clerk to enter these items by hitting a mere number of keys on the register.

The Government's proposal that the post-hoc rationalizations proffered by the Plaintiffs were not accepted and were rightly rejected by the Agency.    However, there are many reasons why the Plaintiffs' clientele makes purchases in close proximity to one another and those include:

1. <u>Balance Speculation:</u>   EBT participants who shop at this store (as well as other participants across the country) do not always know what the remaining balance is on their benefits when they enter the store.  Accordingly, they will sort their food into two groups: that which they believe is necessary, and that which is optional (or that which they believe they can afford, and that which they aren't certain).  They will make the initial purchase (which is in an amount they are reasonably certain is less than the remaining benefits they have on the month), and then request the second purchase to "test" the balance to see whether or not they have sufficient money to purchase the remainder of the food.  The food amounts are pre-calculated at the register, and then transacted consecutively based upon the authorization of the original amount.   The government believes that the SNAP households have other means to check their balances – which is an accurate assessment – but this method, for whatever reason, is sometimes preferred by individual households.

2. <u>Impulse Purchases:</u>   As with many other stores across the country, the Plaintiffs are organized in such a way as to encourage impulse purchases when the customer is at the

counter transacting other business. When it comes to the Plaintiff's store (and the group of participants who shop there), there is a variety of food within a few steps of the register. During transactions for other food items, participants will often make selections of snack and candy food items which they will delay in presenting to the cashier until after the first transaction has been totaled. The clerk will complete the first purchase and enter the charge information into the EBT terminal, and while the customer completes the transaction on the EBT terminal, the clerk tabulates the second transaction. The first transaction would complete around the time the second had been tabulated, and the second would be entered into the machine for processing. These transactions appear throughout Attachment 1, and appear with a large transaction first, and a smaller transaction second. This used to happen routinely with families and multimember households (often with children) who exercised little discretion in their purchases. In either case, these transactions are legitimate in nature.

3. <u>Separate Household Transactions:</u>  Some EBT participants portion their benefits every month between the different (adult) members of the household. In order to more easily track the amount of money they spend at the store, they break apart their transactions. For instance, two household members will shop at the Plaintiffs' store, selecting their items at the same time. Frequently these purchases include frozen food and other bulk purchases – relatively few items for higher dollar figures. They appear at the register together where the clerk tabulates the few items from the first household member and enters the charge information into the EBT terminal.

4. <u>Co-Shopping:</u>  A major change in the shopping habits of the participants since the inception of the ALERT system, households tend to conduct their shopping trips with multiple adults either together (which results in higher purchase transaction sizes), or separately (where each adult is responsible for his/her own groceries, and only a small portion of communal groceries like milk, butter and other items). Depositions of the households are expected to produce sworn testimony indicating that such co-shopping is a regular occurrence at this store, and skews the transaction

Nevertheless, these transactions were not the result of trafficking habits, but rather the result of shopping habits that differ from what the Agency believes should have occurred. Such belief on the part of the Defendant is predicated upon a nexus between the alleged violation (trafficking) and the transactions.

It is further the belief of the Plaintiffs that a deposition of the Analyst in this matter (Ms. Rebekah Hilty) would also reveal additional assumptions on the part of the Department about how the transactions are physically accomplished which may show that the Department lacked sufficient knowledge of the store or its processes to make an accurate decision.  Such

assumptions include limitations on the size of the countertop at the store, the purchasing preferences of the SNAP households, and access to and availability of transportation.[18]

(3)   <u>Transactions Involving the Depletion of the Majority or All of a Household's Benefits in a Short Timeframe.</u>

Not to point out the obvious, the Plaintiffs cannot control how quickly its SNAP participant customers spend their money, nor should they be somehow responsible or required to turn away business simply because they choose to continue to make significant purchases from the store.  There's no statutory or regulatory basis for the Agency to punish Plaintiffs for such actions over which it has no control, and which would harm the Plaintiffs' business' continued existence without reasonable basis.

In any case, the participant's benefits are being exhausted because they're making large, legitimate purchases of food and other eligible items from the store – sometimes for themselves, sometimes for their friends or extended family members who have not received their benefits, or are otherwise in need.  However, the government rejected the Plaintiffs' explanations based upon the inventory that they found to be focused mostly on snack foods and soda.  The government did not, however, interview the SNAP participants to inquire as to what they were purchasing. Many of the local participants spend their EBT funds on junk food as it is one of the few luxuries they can afford.  Furthermore, the SNAP benefits come free to them, so they make use of them however they believe necessary.  Nevertheless, an interview of the households is the only way to remove the wrote speculation engaged in by the Defendant: the government does not cite purchasing preferences for SNAP households in the Plaintiffs' geographic area, nor the household's demographics, physical location or size.  All of these factors play into how these transactions come to pass, and can only be determined with certainty by an interview

---

[18] Simply because a participant occasionally has transportation as the result of a friend or family member, does not mean that the participant can rely on that family member to be present when grocery shopping needs to occur *every time* it needs to occur.

(deposition) of the household. The Plaintiffs intend to take these Depositions, which will adequately address the content of these types of transactions, which may in turn be supported by vendor invoices and inventory records (also to be produced through discovery).

         (4) <u>Large Purchases</u>

To begin with, the Government states that the Plaintiffs' store "is not viewed as a grocery store and did not maintain the staple foods inventory that would qualify the firm to be classified as such."  However, the photographs in the Administrative Record reflects a sufficient array of staple foods, snack foods, along with a sufficient freezer selection of food. A.R. 153 – 175. Furthermore, the inventory records supplied to the government (and found at A.R. 119 to 152, and from 176 to 186) demonstrate that the necessary food items were on the shelves.  These invoiced were unreasonably excluded from the government's analysis because they couldn't verify that eligible food items were sold by the vendors for whom the invoices where submitted. Furthermore, not all of the records have been produced, as more are anticipated to arrive in discovery.

In any case, the exact reason why large purchases are made by participants resides only within the mind of the participants themselves.  There are no FNS regulations limiting the size of SNAP transactions.  Should these participants have wished to do so, they could have spent their entire benefit award on pretzels and coke in one sitting.  The store would have no option but to process said transaction (see 7 C.F.R. 278.2(b) compelling stores to accept SNAP transactions for eligible items, regardless of contents of the transaction).  Wrote speculation about why a SNAP household may or may not make certain purchases is little more than blind guessing, and where discovery may (and should) result in the production of exact reasons, assumptions should give way to actual evidence.

## IV.   <u>STATEMENTS OF FACT: THE PLAINTIFFS'  BUSINESS</u>

The Plaintiff have attached hereto an affidavit reaffirming that the statements and evidence offered by him that is contained in the Administrative Records are true and accurate to the best of his knowledge (**Exhibit D**).  However, as discovery continues to proceed in this matter, the Plaintiffs seek to demonstrate that their inventory flow, pricing and business model were not contemplated by the ALERT data or the analyst, and that considerable oversights were made by the Department.

The Plaintiff will seek to demonstrate (through testimony of the store's owner and yet-to-be-identified SNAP participants) that regular SNAP transactions at the store involved a considerable amount of the higher priced items in the store, collected by a number of members from the same household.

Evidence currently in the Administrative Record includes: a list of foods sold by the store, pricing showing large dollar items; photos of some of the items; and vendor invoices showing some of the purchases of the foods kept in the store.  Upon completion of discovery in this matter, it is anticipated that additional evidence from vendors will be available demonstrating the flow of inventory through the store. Furthermore, once identified, the SNAP participants cited by the Defendant are expected to be called to testify about the nature of the transactions, to include detailed accounts of foods and quantities purchased by them at the Plaintiffs' store.

The Plaintiff's Affidavit in support provides support for the position, and demonstrate the existence of a material fact under genuine dispute: the Plaintiffs can adequately account for the transactions the Defendant claims are indicative of trafficking, or will be able to adequately account for the shopping habits of its participants once they are deposed.  At this stage, where

zero discovery has been permitted, the Plaintiffs cannot be said to have been given a fair opportunity to make their case, cross-examine the Defendant's evidence, and discover additional supporting records and documents.

## V.   AUTHORITIES PERTINENT TO THIS MOTION
### A.   Review of Administrative Decisions in SNAP Cases

As mentioned throughout this response, a District court's role in these proceedings is to conduct a *de novo* evaluation of the facts underlying the parties' positions and to come to a decision, on its own, as to whether or not the Plaintiffs have established their case that it is more likely than not that trafficking did not occur at the store.  See *Redmond vs. U.S.*, 507 F.2d 1007 (5th Cir. 1975), rehearing denied 510 F.2d 384.  "By rejecting the substantial evidence standard of review [from the Administrative Procedures Act] in the Food Stamp Program and permitting a trial *de novo*, Congress intended nothing more than that the district court would not be bound by the administrative record."  *Id* at 1011.  See also *Saunders vs. US*, 507 F.2d 33 (6th Cir. 1974) holding that the statute "requires a reexamination of the entire matter rather than a mere determination of whether the administrative findings are supported by substantial evidence."  *Id* at 36.  The Circuit Court continued, "the court should make its own findings of fact based on the preponderance of the evidence and not limit itself to matters considered in the administrative proceedings."  *Id*.

With respect to the admissibility of the contents of the administrative record, the Court in *Saunders* held that "even if the unsworn statements relied upon by the government were sufficient to support a determination at the administrative level, the provision for a trial *de novo* requires that the district court make its determination on evidence of a kind and quantity sufficient to support findings of fact."  *Id*.

### B.   On-Point Case Law Pertaining to Early Motions for Summary Judgment

It is the routine practice of some USDA regional counsels to push for a Motion for Summary Judgment to be filed by the U.S. Attorney's office, as though this were a basic judicial appeal of an administrative record in the style of a traditional Administrative Practices Act case and not a *de novo* matter that is broad in scope than the limited corners of the A.R.  Accordingly, other districts have previously addressed whether or not a Motion for Summary Judgment is appropriate, and have often found that it isn't.

In the SNAP Violation case, *Brothers Food & Liquor, Inc., vs. U.S*., 626 F.Supp.2d 875, 880-881 (E.D. Ill. 2009), the District Court held that where a plaintiff presents some justifiable inferences which call into question whether it actually engaged in food stamp trafficking, the Government is not entitled to a judgment as a matter of law.  Likewise, *Saunders* mentioned above concurs with the approach of the court in *Brothers*.

> "Since the procedures followed at the administrative level do not provide for discovery or testing the evidence of the Department of Agriculture by cross-examination, it is particularly important that an aggrieved person who seeks judicial review in a trial de novo not be deprived of these traditional tools unless it is clear that no issue of fact exists. As the court pointed out in *Miller v. United States*, 54 F.R.D. 471 (W.D. Pa. 1972), all doubts as to the presence of a genuine issue of material fact should be resolved against a party moving for summary judgment.  The unsworn denials of appellant through his counsel raised sufficient doubts about the facts set forth in the unsworn statements which were the basis of the administrative determination of disqualification to preclude summary judgment at this stage of the proceedings."  *Id*.

**C.**     **<u>Summary Judgment Standards</u>**

Generally speaking, Summary Judgment is appropriate when the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movement is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).  The moving party bears the initial burden of demonstrating that there is no genuine issue of material fact, and judgment as a matter of law should be granted in their favor.

*Id.*  Once the moving party has met the initial burden, the non-moving party must offer more than a mere scintilla of evidence to survive summary judgment.  See *Roger Witmore's Auto Servs. v. Lake County, Ill,* 424 F.3d 659, 667 (7th Cir. 2005).

In ruling on a motion for summary judgment, only admissible testimony having probative force is to be considered.    As in general, summary judgment testimony that simply reflects legal conclusions is inadmissible.  Thus, for example, the Defendant's motion reflects that there are no genuine issues of material fact and thus is an inadmissible legal conclusion.

VI.      **LEGAL ARGUMENT**
  A.      **The Court Should Deny Summary Judgment in Light of the Genuine Dispute as to Whether any Trafficking Occurred**

Plaintiffs are entitled to *de novo* review, See 7 U.S.C. § 2023(a)(15).   Unlike other administrative challenges under the Administrative Procedures Act, the Court is not strictly held to a review the sufficiency of the administrative decision, but instead, must "reach its own factual and legal conclusions."  The Defendant's entire motion is predicated upon this Court's automatic acceptance of the government's unsupported assumptions: (1) that the SNAP households shopping at this store are "average" in size; (2) that these households prefer to shop at larger stores rather than the Plaintiffs'; (3) that the transaction patterns have a nexus to trafficking; (4) that the selected comparison stores do not differ in any material way (notably, the comparison stores aren't named, but the A.R. also lacks the on-site inspection for those stores to identify other causes why the participants may shop at the Plaintiffs', such as selection, inventory specifications, store layout, store cleanliness, convenience, language barriers, marketing habits, or other, hereto unanticipated variables); (5) that state averages have a meaningful relevance to the store's sales (the store is located in a lower-income residential area.  Averages for statewide, county wide and city wide stores include stores in substantively different environments which

are not suitable for comparison, thus skewing the averages down  Also, distribution and range of store transactions would be meaningful information: if the average were the result of a reverse-bell curve, then very few stores would be average, and most stores would be significantly above or below average); and (6) that the invoices and records submitted to the Defendant during prior phases of this case should be ignored because Mr. Lay could not identify where they came from. All of this warrants an evaluation by the Court free from the built in assumptions upon which the government previously based its decision.

The issue before this Court is not whether the government "fully considered" the Plaintiffs' evidence, or whether the Defendant merely made "an error," or even whether the Defendant acted with evidentiary support when it "ultimately rejected" the Plaintiffs' evidence in favor of its own preferred conclusions.  Rather, the Court must ultimately decide if trafficking actually occurred, *or* if the Defendant's decision was otherwise "invalid" as contemplated by 7 U.S.C. §2023(13) – (16).

The evidence presented herein, in a light viewed most favorably to the Plaintiffs, by the Plaintiffs position do two things: (1) prove that reasonable alternatives to trafficking exist as contemplated by *Skyson*; and (2) the evidence and assumptions relied upon by the Defendant, which has not yet been subject to cross examination, testing or attack, is potentially inaccurate and/or inadmissible to establish the existence of trafficking.

Specifically with respect to the short periods of time: the Plaintiffs have reasonably argued that the households will make two or more trips over the course of 24 hours (for a total of more than $100.00) for a number of valid, legitimate reasons.  In some instances, multiple persons from the same household will shop together, make different selections and allocate their benefits (termed as "co-shopping"); will make multiple trips to complete a single large grocery

purchase due to logistics; will make supplemental purchases in the store after making an original purchase (for children or other household members who ask for additional items after the initial transaction); and will make multiple trips to purchase items that have been forgotten, or that they have decided to purchase later.  As noted in *Skyson*, many of these explanations have been previously held to provide a legitimate, alternative explanation for how the transactions have come about.

With respect to large purchase transactions, the Plaintiffs argue the following: the high cost for some of the items sold by the store cause transaction sizes to be larger than what may be expected by the Department.

These are legitimate explanations that are logical, reasonable in nature, and create a material issue of disputed fact.

### B.    Plaintiffs' Evidence Creates Genuine Disputes of Material Fact That Must Be Resolved at Trial, or at Least Given the Benefit of Discovery

To defeat summary judgment, Plaintiffs must merely produce evidence "such that a reasonable jury could return a verdict for the nonmoving party," here Plaintiff.  *See Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).  This court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Donnelly v. Greenburgh Cent. School Dist. No. 7*, 691 F.3d 134, 141 (2d Cir. 2012) (internal quotations omitted).  "Summary Judgment is appropriate only where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Id.*  This all, however, is predicated upon the non-moving party being permitted to conduct some level of discovery to produce evidence in its support.  The government here argues that the Plaintiffs' should never be permitted to cross-examine the government's evidence because the Defendant already decided that it's correct in disqualifying the Plaintiffs, and that its assumptions and findings (which have

never before seen the light of day and are taken as truth despite lacking support in the A.R.) are infallible.

Furthermore, given the obvious intent of 7 U.S.C. §2023 in granting the Plaintiffs the right to a "*de novo* trial", Congress has specifically intended that this case not be resolved immediately, without the benefit of discovery, and effectively only within the four corners of the A.R.  If discovery is not permitted now, what would the Plaintiffs' be expected to produce except that which is within the four-corners of the A.R.?  A ruling in favor of the government would all but neuter the one aspect of due process in this entire system: the opportunity for a fair hearing, subject to discovery and evidentiary rules in accordance with the Constitution and U.S. law.

The Households have not been identified, making it impossible for the Plaintiffs to bring more sworn testimony to bare against the Government's allegations.  The comparison stores have not been identified.  The data underlying the "averages" to which the store is set against have not been produced.  The inventory records in the possession of vendors haven't been subpoenaed because such authority has not previously existed (and does not currently).

These disclosures (and specifically the identity of the households) have traditionally been considered necessary by Courts evaluating SNAP violation cases: the court in *Han v. FNS*, 580 F. Supp. 1564 (D.N.J. 1984) denied summary judgment in similar circumstances.   The owner there complained, as here, that "the identifies of. . .[those] who made the purchases in issue were never disclosed to him during administrative proceedings." *Id*. at 1566.  The owner asked the court to deny summary judgment under the precursor to Rule 56(d).  The court agreed, admonishing the Government that "it is singularly inappropriate to shield those witnesses from disclosure by the bringing of a motion for summary judgment without any accompanying

revelation of the identify of those individuals." *Id*. at 1568. This Court should deny the Government's motion for summary judgment for the same reasons adopted in *Han*.

## VII.   <u>CONCLUSION</u>

I do not write this response lightly, nor with any intent to cast unnecessary aspersions upon the government or its counsel.  Having said that, it is difficult to view the government's motion to dismiss and/or for summary judgment as anything other than an attempt to subvert due process.  It is patently unreasonably to allege that the Plaintiffs have failed to state a cause of action when 7 U.S.C. 2023(13)-(16), in no uncertain terms, grant this Court specific and automatic authority to conduct a *de novo* review of the matter merely upon petition from the Plaintiffs.  Such petition exists here.  The motion to dismiss can be only described as frivolous.

The alternative motion for summary judgment, being filed without even bothering to Answer the Complaint, illustrates the audacity and hubris of the government in SNAP cases. Their entire case is predicated upon a nexus between these three transaction types (fast in time transactions; depletion of SNAP household benefits; and large purchases) and the existence of trafficking.  This nexus is taken for granted in the A.R., and never actually explained.  One would expect a data analysis system to be supported by statistical studies, or some other analytical review to verify its accuracy and correlation. None of that exists, and to boot, the very source for the patterns (RIB investigations) indicates that a mere fraction of the system's findings are actually accurate.

The Plaintiffs should be afforded an opportunity to take depositions of the households and the government officials to prove their case that these transactions were for eligible food items.  The Plaintiffs should be granted an opportunity to expand outside of the four corners of the A.R. by seeking document production from the State (pertaining to household shopping habits), from vendors (to compile a more complete inventory record), and to be able to identify

differences between the comparison stores and the Plaintiffs' operation.  Without this, there would be no purpose or benefit of the de novo judicial review provisions set out in 7 USC 2023.

Finally, the Government failed to Answer the Complaint, meaning that the allegations set forth are taken as admitted for these purposes.  The Plaintiffs alleged, in no uncertain terms, that the government's analysis was substantively flawed and failed to accurately weigh the explanations provided by the Defendant.  These statements, taken as true, mean that the government's motion must be denied.  If this matter were at trial, right now, and the government had admitted these allegations, the only appropriate finding by the Court would be to grant the relief sought by the Plaintiff as the Defendant had admitted its faults and failings.

Therefore, this motion should be denied, in its entirety.  Costs and fees should be awarded to the Plaintiffs for having to respond to these baseless motions.

Dated:  December 1st, 2017                    Respectfully submitted,

*Andrew Z. Tapp*

Andrew Z. Tapp, Esquire
Pro Hac Vice
Florida Bar Number:  68002
Metropolitan Law Group, PPC
1971 W. Lumsden Road, #326
Brandon, Florida 33511-8820
(813) 228-0658
Andrew@Metropolitan.legal
Lajeana@Metropolitan.legal
-and-
William N. Sinclair, Esquire
Maryland Bar Number: 28833
Pierce C. Murphy, Esquire
Maryland Bar Number: 30030
Silverman, Thompson, Slutkin and White
201 N. Charles Street
Baltimore, Maryland 21201
(410) 385-2225
bsinclair@mdattorney.com
pmurphy@mdattorney.com
**COUNSEL FOR PLAINTIFFS**